UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:20-CR-198-BR

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MICHAEL LANE BREEDEN | ) | |

This matter is before the court on defendant's *pro se* motion to suppress and dismiss. (DE # 40.) The government filed a response in opposition. (DE # 44.)

Defendant is charged with being a felon in possession of a firearm on or about 7 January 2020 and being a felon in possession of ammunition from on or about 25 December 2019 until on or about 7 January 2020. (Super. Ind., DE # 21.) After defendant's initial appearance, U.S. Magistrate Judge Robert B. Jones, Jr. held a hearing on defense counsel's motion to withdraw based on defendant's desire to represent himself. The court determined that defendant had knowingly, intelligently, and voluntarily waived his right to counsel. (5/24/21 Order, DE # 34, at 3.) Therefore, the court permitted defendant to represent himself in this matter and appointed standby counsel. (Id. at 4.) With leave of court, defendant filed the instant motion out of time. (See 6/29/21 Order, DE # 39.)

First, defendant appears to contend that dismissal of the charges against him is warranted because his "corrected" name is Mikail Abdul Alim EL and this court lacks jurisdiction over him as a "Moor American" and an indigenous person. (See Mot., DE # 40, at 2, 9.) The fact that defendant may have changed his name, even prior to the filing of the instant charges, does not affect validity of the indictment.[1] Cf. United States v. Reed, No. CR 17-253 (MJD/BRT), 2018

---

[1] Defendant has not submitted any evidence that he legally changed his name.

WL 4233836, at *7 (D. Minn. July 11, 2018) (report and recommendation) (recommending denial of the defendant's motion to dismiss on the ground that the indictment refers to him by an incorrect name and the government be ordered to file a corrected indictment listing the defendant by his legal name), adopted, 2018 WL 4232999 (D. Minn. Sept. 5, 2018). Similarly, the fact that defendant might be Moorish and protected by the United Nations Declaration on the Rights of Indigenous Peoples does not deprive this court of jurisdiction over him. See Dingle v. Baggett, No. 5:19-CV-00425-D, 2020 WL 5245986, at *4 (E.D.N.C. July 31, 2020) (memorandum and recommendation) ("The Declaration is a resolution affirming that indigenous people are equal to all other people. Additionally, it recognizes the right of all people to be different and to be respected for their differences. Dingle's claim under the Declaration is frivolous because it does not provide him with rights he can enforce in this court." (citations omitted)), objections overruled, 2020 WL 5217393 (E.D.N.C. Sept. 1, 2020); United States v. Smalls, No. 2:16-CR-950, 2018 WL 6065383, at *3 (D.S.C. Nov. 20, 2018) (rejecting the defendant's argument that the district court lacks jurisdiction over him due to his claimed status as a Moorish National) (collecting cases). This court has personal jurisdiction over any defendant, like defendant here, who is physically present in the United States. See United States v. White, 480 F. App'x 193, 194 (4th Cir. 2012) ("Physical presence in the United States usually supplies the only necessary prerequisite for personal jurisdiction in a federal criminal prosecution." (citations omitted)). Therefore, the court will not dismiss the superseding indictment for lack of jurisdiction over defendant.

Also, defendant cites to 18 U.S.C. § 3289 as a purported basis for dismissal. (See Mot., DE # 40, at 1, 8.) That statute pertains to the timeliness of the return of a new indictment when a prior indictment has been dismissed, see 18 U.S.C. § 3289 ("Whenever an indictment or

2

information charging a felony is dismissed for any reason before the period prescribed by the applicable statute of limitations has expired, and such period will expire within six calendar months of the date of the dismissal of the indictment or information, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the expiration of the applicable statute of limitations . . . ."), and has no application here.

Next, to the extent defendant challenges the court's subject matter jurisdiction, (see Mot., DE # 40, at 8-9), the court rejects such a challenge.

> Neither the citizenship nor the heritage of a defendant constitutes a key ingredient to a district court's jurisdiction in criminal prosecutions: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the states, of all offenses against the laws of the United States." 18 U.S.C. § 3231 (2006); *see also Hugi v. United States*, 164 F.3d 378, 380 (7th Cir. 1999) ("Subject-matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231, and there can be no doubt that Article III permits Congress to assign federal criminal prosecutions to federal courts. That's the beginning and the end of the 'jurisdictional' inquiry.") (quoted in *United States v. Hartwell*, 448 F.3d 707, 716 (4th Cir. 2006)).

White, 480 F. App'x at 194. The offenses charged in the superseding indictment are federal offenses, and this Article III court possesses subject matter jurisdiction over their prosecution.

Defendant also appears to contend that the superseding indictment should be dismissed because there is a fatal variance between that indictment and the evidence. (See Mot., DE # 40, at 8.)

> "A fatal variance occurs 'when the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" *United States v. Mason*, 532 F. App'x 432, 435 (4th Cir. 2013) (quoting *United States v. Allmendinger*, 706 F.3d 330, 339 (4th Cir. 2013)). However, not all variances are fatal. *Id.* If the Government's proof at trial diverges to some degree from the indictment but does not change the crime charged in the indictment, then a mere variance occurs. *Id.* "'A mere variance does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense.'" *Id.* (quoting *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999)); *see also*

3

> *United States v. Brewer*, 1 F.3d 1430, 1437 (4th Cir. 1993) (citation omitted) ("The rule against variance protects defendants by insuring that the indictment provides them with adequate notice to prepare a defense and describes the crime with sufficient particularity to protect them from multiple prosecutions for the same offense.").

United States v. Brown, No. 3:11-CR-63-01, 2015 WL 965943, at *7 (E.D. Va. Mar. 4, 2015). Obviously, it is not appropriate to dismiss the superseding indictment on this ground because defendant's trial, with the government's presentation of evidence, has not even begun.

Finally, defendant seeks to suppress evidence seized from his "private dwelling" pursuant to a search warrant for 2222 Robert Bessie Road, Lumberton, North Carolina, primarily because probable cause was purportedly lacking.[2] (Mot., DE # 40, at 3.)

> The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This constitutional protection is realized through the requirement that a "neutral and detached magistrate" find probable cause to support a warrant.
> The evaluation of whether a search warrant is supported by probable cause turns first on whether the items to be seized are evidence of criminal activity, and second, on "whether it is reasonable to believe that the items to be seized will be found in the place to be searched." This analysis utilizes a totality-of-the-circumstances approach grounded in the commonsense recognition that "affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation" and officers in the field rely upon their training and experience to draw reasonable inferences from the evidence. A magistrate must consequently "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place."
> To satisfy the second prong of the probable cause inquiry, an affiant must show a sufficient "nexus between the place to be searched and the items to be seized." Whether such a nexus exists turns on "the nature of the item and the normal inferences of where one would likely keep such evidence." Again, officers may draw conclusions from their experience, judgment, and observations when identifying the place to be searched. The magistrate may draw a reasonable

---

[2] Defendant's motion also refers to state arrest warrants and an apparent search warrant for 517 Quail Run Road, Lumberton, North Carolina. (See Mot., DE # 40, at 3-4.) The validity of defendant's state arrest(s) is not at issue in this case, as defendant was arrested by a federal officer pursuant to a federal arrest warrant. (See Warrant, DE # 30.) The search warrant for the Quail Run Road property, if any, is not in the record. Because the subject firearm and ammunition were seized from the Robert Bessie Road property, (see Resp., Ex., DE # 44-1, at 10), the search warrant for that address appears to be the appropriate one, if any, for defendant to challenge.

4

> inference from the facts stated if the affiant does not assert facts "directly linking the items sought to the defendant's residence."
>
> The "normal inferences test" of the nexus analysis starts with the general rule that "it is reasonable ... to assume that a person keeps his possessions where he resides." The applicability of this assumption depends on the nature of the evidence to be seized and the offense under investigation. For example, "the use of a gun in the commission of a crime is sufficient to establish a nexus between the suspected criminal's gun and his residence" because guns are generally kept in the home.

United States v. Wienke, 733 F. App'x 65, 69-70 (4th Cir. 2018) (citations omitted).

If evidence is obtained in violation of the Fourth Amendment, the general rule is suppression of the evidence is the appropriate remedy. United States v. Andrews, 577 F.3d 231, 235 (4th Cir. 2009). However, the Supreme Court has recognized a "good faith" exception to this rule. Under this exception, "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" Id. at 236 (quoting United States v. Leon, 468 U.S. 897, 922 (1984)).

> Typically, "a warrant issued by a magistrate ... suffices to establish that a law enforcement officer has acted in good faith in conducting the search" and thus searches executed "pursuant to a warrant will rarely require any deep inquiry into reasonableness." That said, the Supreme Court identified four circumstances in which an officer's reliance on a search warrant would not be "objectively reasonable": (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role" as a detached and neutral decisionmaker; (3) where the officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where "a warrant [is] so facially deficient ... that the executing officers cannot reasonably presume it to be valid."

Id. (quoting Leon, 468 U.S. at 922-23)).

Here, the warrant authorized officers to search the Robert Bessie Road premises; persons and vehicles there at the time of warrant's execution; and outbuildings, for evidence of violations of North Carolina law, namely, murder, robbery with a dangerous weapon, and possession of a firearm by a felon. (Resp., Ex., DE # 44-1, at 3-4.) It specified the following items to be seized:

5

9mm handgun; 9mm ammunition and spent casings; all firearms and ammunition; all weapons that could cause the death of the victim; all articles deemed illegal; DNA-related items; documents showing ownership and control; all electronic devices; all clothing worn by the suspect at the time of the assault; all items with blood on them; and all shell casings. (Id.)

For the facts establishing probable cause, the warrant's application referenced the attached document "titled 'Probable Cause Affidavit'." (Id. at 4.) The 6 January 2020 affidavit of Detective Joshua Rozier, Robeson County Sheriff's Office, was filed with the application. The relevant portion of that affidavit provides:

> On December 25, 2019 at 8:23 pm Robeson County Sheriff's Office responded to 593 Avery Road, St. Pauls in reference to a subject shot. Deputy Kareem Graham was the responding officer. Deputy Graham stated when he arrived, he spoke with Dewayne Rozier which is a cousin to the victim Richard Gilchrist. Deputy Graham stated Dewayne told him a burgundy vehicle came to his mother's house and two females got out and started yelling "Richard had been shot". Dewayne stated he jumped in his vehicle and went to Richard's house. Dewayne stated when he pulled up the two females told him to stop. Dewayne stated he wasn't aware of the situation. Dewayne stated when he stepped to the rear east corner of the house, an individual shot at him. Dewayne stated he then fired his firearm back at the individual. Dewayne stated the individual was standing in the wooded area by the two barrels.
>
> Deputy Graham stated Richard was in the bed and a guy kicked in his door asking for money. Richard stated he told the guy that he did not have any money. Richard stated the guy then started shooting.
>
> Lt Duckworth responded to the scene. Lt Duckworth spoke with Ashley Kayla Floyd. Ashley stated, her and Richard got home about 4:00pm. Ashley stated when she gets out of the shower, she heard a knock at the rear door. Ashley stated she heard a man saying "Give me the dope." Ashley stated she heard Richard say "I don't have any." Ashley stated then the guy shoots him, Ashley stated she heard the guy say next "where is the money?" Ashley stated she heard Richard say "I don't have any." Ashley stated she then heard another gun shot. Ashley stated she heard Richard say "Here man!" Ashley stated she heard the guy demand car keys, and Richard gives them to the guy. Ashley stated the guy then shot Richard again.
>
> On January 3, 2020 around 3:30pm, I receive[d] a call from Lt. Duckworth stating Richard Gilchrist had died from his injuries sustained on December 25, 2019. Lt. Duckworth spoke with Christine Hunt by phone and she stated she would meet

> Duckworth and I at Littlefield Middle School. Lt. Duckworth informed me that she was at the residence at the time of the shooting.
>
> On January 3, 2020 at 4:45pm Lt. Duckworth and myself were at Littlefield Middle School speaking with Christine Hunt in reference to the shooting on Avery Road. Hunt stated she was at Richard's house on Christmas night around 8:00 pm. Hunt stated she was standing in Richard[']s doorway at his room. Hunt stated all of a sudden Richard stated "What the fuck is that?" Hunt stated when she turned around all she seen was a black gun. Ms. Hunt stated she heard the guy say "Where is the dope at?" Hunt stated the[] guy then shot. Hunt stated she dropped to the floor and said please don't shoot me. Hunt stated that's when he pointed the gun at my head and said "Get the fuck out of here." Hunt stated that's when she realized it was Michael Breeden. Hunt stated she recognized Breeden's voice. Hunt stated Breeden has a nick name of "Daewoo." Hunt stated that she got into her car and went to get help. Hunt stated she has known Michael for 15-20 years now. Hunt stated Breeden dates her sister (Nancy Hunt) and they got two kids together. Hunt stated that she is 100% sure that the voice she heard at Richard's house was Michael Breeden's. Hunt stated that on Friday, January 3, 2020[] she was at the Dollar Tree in Lumberton when she seen Nancy. Hunt stated Nancy said "Please don't say nothing." Hunt stated she then pulled off from the store.
>
> On January 5, 2020 at 4:45pm I ride by 2222 Robert Bessie Road, Lumberton and I observed Michael Breeden walking in the front yard. Breeden was wearing all black cloths. There was a fire in the back yard going. I also observed an abandoned house behind the residence.

(Id. at 6-7.)

On the same day as the warrant's application, a North Carolina Superior Court Judge issued the warrant and ordered that Detective Rozier's affidavit be sealed. (Id. at 3, 9.) The following day, 7 January 2020, a shotgun, ammunition, and shell casings, among other items, were seized from the property. (Id. at 10.)

Initially, defendant argues there was not a sufficient nexus linking the evidence sought and the Robert Bessie Road property. (Mot., DE # 40, at 4; see also id. at 6, 9.) According to defendant, the warrant's application is insufficient because it does not identify a connection between him and the address. (See id. at 4.) The only information linking defendant to the Robert Bessie Road address is Detective Rozier's testimony that one day earlier, he saw

7

defendant, wearing all black, walking in the front yard of the property. Assuming that such evidence is insufficient to reasonably infer that defendant lives, stays, or otherwise would be expected to keep his firearms, ammunition, clothing, and other items to be seized at the property, and thus probable cause was lacking, the court considers whether the officer's reliance on the warrant was objectively reasonable. See United States v. Harris, 215 F. App'x 262, 270-72 (4th Cir. 2007) (concluding probable cause was lacking where the affidavit did not provide information that the defendant stayed at the apartment to be searched, but proceeding to consider whether the officers acted in good-faith in relying on the warrant). In conjunction with this assessment, the court also considers the other challenges defendant raises to the search warrant.

      The omission from Detective Rozier's affidavit of information indicating that defendant lived at (or is otherwise associated with) the Robert Bessie Road address appears inadvertent. Detective Rozier personally surveilled that address in an obvious effort to confirm defendant's connection to the address, which, the government represents, law enforcement databases associate with defendant and is also the home of defendant's girlfriend, Nancy Hunt, (Resp., DE # 44, at 4). Detective Rozier's affidavit amply details eyewitnesses' and the victim's statements of the suspect's shooting of the victim, the suspect's demanding car keys, money, and drugs from the victim, the identification of defendant as the suspect, and defendant's relationship with Nancy Hunt. It is reasonable to infer that a person involved in a shooting and robbery would have his firearm, items with DNA on them, and the other items identified in the warrant at his residence or place where he stays regularly. Reading Detective Rozier's affidavit as a whole, his reliance on the warrant was objectively reasonable even though his affidavit was missing additional information linking defendant to the Robert Bessie Road address. See Harris, 215 F. App'x at 272 (concluding the officers' reliance on a warrant lacking statements that the

defendant lived at the apartment to be searched and the grounds for believing that was objectively reasonable).

Next, defendant takes issue with the description of the items to be seized. First, defendant characterizes the warrant's application and supporting documents as "general" in terms of their description of the items sought. (Mot., DE # 40, at 4.) Defendant appears to suggest that the warrant should have been limited to the seizure of very specific items, namely items purportedly stolen from the victim: "car keys, wallet, dope and money." (Id.) Second, defendant claims the warrant was plainly invalid because the warrant did not list the items to be seized and instead relied on the application and Detective Rozier's affidavit, both of which were sealed and did not accompany the warrant when it was executed. (Mot., DE # 40, at 6-7.)

> At its core, the Fourth Amendment protects against general warrants that authorize "exploratory rummaging in a person's belongings ... by requiring a particular description of the things to be seized." The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant.

United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010) (citations omitted). "Significantly, the particularity requirement applies to the warrant, as opposed to the application or the supporting affidavit submitted by the applicant. Thus, '[t]he fact that the application adequately described the 'things to be seized' does not save the warrant from its facial invalidity.'" United States v. Hurwitz, 459 F.3d 463, 470 (4th Cir. 2006) (quoting Groh v. Ramirez, 540 U.S. 551, 557 (2004)).

As recognized above, the warrant sought evidence related to the crimes of murder, robbery with a dangerous weapon, and felon in possession of a firearm. Given these alleged crimes, it is not surprising that the items to be seized centered on weapons which might have caused the victim's death and on items which might have DNA present or which might have

9

identified the suspect's location and communications around the time of the crimes. To be sure, many items are identified in broad terms—"any and all"—but, they are nonetheless specific items, such as firearms and items with blood on them, having some relation to the alleged crimes and readily identifiable by officers executing the warrant. (See Resp., Ex., DE # 44-1, at 4.) This description of the items to be seized does not render the warrant so facially deficient such that the officers could not reasonably presume it to be valid. See Andrews, 577 F.3d at 236.

Defendant is correct that the warrant itself does not describe the items to be seized. Rather, the warrant references "the application on the reverse side" and authorizes the search of the Robert Bessie Road property and the seizure of the property particularly described in the application. (Resp., Ex., DE # 44-1, at 3.) Contrary to defendant's contention, the application was not sealed, (cf. id. at 9 (order sealing only Detective Rozier's affidavit)), and it identified the items to be seized and what was to be searched. (Id. at 4.) The warrant's cross-reference to the application and the application's attachment to the warrant (by being on the reverse side) more than satisfy the Fourth Amendment's particularity requirement. See Hurwitz, 459 F.3d at 471 ("In this circuit, [] it is sufficient *either* for the warrant to incorporate the supporting document by reference *or* for the supporting document to be attached to the warrant itself." (citation omitted)).

Also, defendant correctly points out that the application refers to a document titled "Probable Cause Affidavit" and Detective Rozier's affidavit does not explicitly bear that title. (See Mot., DE # 40, at 4; Resp., Ex., DE # 44-1, at 4.) However, that error could not have misled the judge who issued the warrant. What matters is Detective Rozier set forth the facts in an affidavit in support of the warrant's application, and the judge found those facts sufficient to establish probable cause for issuance of the warrant. (Resp., Ex., DE # 44-1, at 3-8.)

Lastly in his challenge to the search warrant, defendant cites information Detective Rozier omitted from his affidavit. (See Mot., DE # 40, at 4-6.) For example, according to defendant, Christine Hunt has a "crack addiction" and a "breaking and entering charge," and she did not name defendant as the suspect in her call to 911. (Id. at 5.) Another example is the purported statement of "Dewayne" (presumably Dewayne Rozier) that identified an "Indian or white male about 5'9"" as the shooter. (Id. at 5-6.) Nothing in the record suggests Detective Rozier deliberately or recklessly omitted the information defendant cites in order to mislead the issuing judge, and such information was not material to the probable cause determination. See Andrews, 577 F.3d at 238-39 ("In challenging a search warrant on the theory that the officer's affidavit 'omit[ted] material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading,' the defendant must show (1) that the officer deliberately or recklessly omitted the information at issue and (2) that the inclusion of this information would have defeated probable cause." (citations omitted)); id. at 239 ("[A]n omission must do more than potentially affect the probable cause determination: it must be necessary to the finding of probable cause." (internal quotation marks and citation omitted)).

In summary, the court possesses jurisdiction over this criminal prosecution and defendant. Even assuming probable cause was lacking, Detective Rozier reasonably relied on the warrant and otherwise did not deliberately or recklessly omit material information from his

11

affidavit.  Defendant's motion to suppress and dismiss is DENIED.

This 21 July 2021.

_____
W. Earl Britt
Senior U.S. District Judge